This morning is People v. Dallas McIntosh, No. 517-0068. May it please the Court, my name is Kate Harris and I represent Mr. McIntosh in this case. At Mr. McIntosh's guilty plea, the attorney specifically stipulated that on September 25, 2012, Dallas McIntosh was subject to a traffic stop, specifically a failure to signal when changing lanes. Mr. McIntosh's attorney later claimed in testimony that even though he stipulated this fact, he knew at the time that this wasn't true, that it wasn't actually the case. Mr. McIntosh himself, in contrast, did believe at the time that this was true. He was wrong. And as a result of this misapprehension of this fact, which was critical, he pled guilty, not knowing a number of things about this case, and his plea was not voluntary. I want to talk today first, in a briefing we gave a number of reasons that we believed the plea should have been withdrawn at the trial court level. In the briefing, and today I want to focus first on this misapprehension of fact and how that affects this case. And then I'm going to move on separately to the issue of defenses that were available that Mr. McIntosh, of which Mr. McIntosh was not aware at the time of his plea. And in the context of talking about some of those defenses, I'll also move on to some of the issues regarding the court's failure to allow Mr. McIntosh to present the testimony of witnesses that he had subpoenaed, or essentially to continue the hearing because they hadn't showed up pursuant to those subpoenas. The first thing, Your Honors, with regard to the misapprehension of fact in this case, there was a lot of focus in the briefing, particularly the response briefing, on the Fourth Amendment issue and whether a Fourth Amendment issue in this case would have been viable. This Court need not even reach the issue of a question of whether a Fourth Amendment issue would have been viable in order to rule in Mr. McIntosh's favor in this case. The question is whether there was a misapprehension of fact and whether that misapprehension of fact essentially made it such that his plea was not voluntary. And you need not find that the Fourth Amendment was violated in order to find that. The question in determining whether it was voluntary, whether the plea was voluntary, was essentially from Mr. McIntosh's perspective. Would this fact, would knowledge of the truth, as opposed to knowledge of this kind of false fact, this falsity, would he believe to be true, would that have affected his plea? And he testified at the hearing and also stated in a number of his pro se pleadings as well on his own that it would have. So there are a number of reasons that, and I want to talk a little bit about the effect of this stipulation and why that's important in deciding the case. The stipulation that Mr. McIntosh's attorney made in open court at the time of the plea was a representation to the court that he believed that fact to be true, that Mr. Mettis at the time believed that Mr. McIntosh had been stopped in the context of a traffic stop due to a failure to signal when changing lanes. Pursuant to the Feldman case, he can't come back later and say, actually, I didn't believe that to be true. I think Feldman makes very clear that you can't make a stipulation in front of the court and then come back and then try to present evidence that, oh, well, it wasn't actually true at the time because it benefits you. And in this context, the benefit to Mr. Mettis in trying to present that evidence later was an avoidance of finding of ineffective assistance of counsel. Did you have a question? I didn't. No, no, I'm thinking, but I'm taking you on. I wasn't sure. I just wanted to make sure you weren't, obviously, you shouldn't feel the need to reply. So pursuant to Feldman, and I want to say the court didn't explicitly make any finding in this case that Mr. Mettis believed at the time that or knew at the time that the traffic stop that Mr. McIntosh had indeed signaled. It didn't explicitly make that finding, but it did make the finding. And it also didn't explicitly make a finding that my client waived a Fourth Amendment violation. What the trial court said in this regard is, well, it would be reasonable to conclude that the defendant waived his Fourth Amendment rights as a result of this negotiated plea deal. So first of all, the court did not explicitly make that finding, and I think for that reason alone, we don't have sufficient findings in order to deny the motion to withdraw a guilty plea. But secondly, Your Honor, the kind of assumption to draw from the court, from what the court did state, is that, okay, it was finding Mr. Mettis' testimony credible. It was finding that Mr. Mettis had seen this Fourth Amendment violation and had discussed it with Mr. McIntosh. So the effect of the judicial mission, essentially Mr. Mettis' stipulation of this fact, is that pursuant to Feldman, the court can't find it. Based on Feldman. So that's one of the effects of the judicial mission. The second effect of the judicial mission has to do with the fact with what Mr. McIntosh believed to be true and what he testified he believed to be true at the time of the plea. He said at the time of the plea that he believed he had indeed not failed to signal, and there was no Fourth Amendment violation to raise in his case. And there was no — there's also other reasons that this fact gives rise to certain offenses. But if you look at the Doherty case and all the cases around the motions to withdraw a guilty plea, one of the things when they talk about misapprehensions of fact, there needs to be substantial objective proof that a defendant's mistaken impressions were reasonably justified. And this stipulation of fact that both attorneys stipulated to before the court shows, demonstrates, that there was no misapprehension of fact. I think beyond any doubt that Mr. McIntosh's impression that he had indeed failed to signal and that was why he was pulled over was reasonably justified. His perception, his misapprehension of fact was reasonably justified. And, counsel, so the defendant did not — you know, the argument is the defendant did not discover the fact that his factual basis was in error until the sentencing hearing? Right. They played the video at the sentencing hearing, the entirety of Exhibit S1. And that was the first time he saw the video and saw that he had indeed signaled. But, according to his counsel, he stated that he did show him the video and discussed it with him, correct? Yes. His counsel did state that. But, again, that's evidence that would — kind of accepting that evidence as true is in violation of the principles articulated in the program. But, yes, his counsel did state that. And there's also questions as to that. There was an exhibit — there's two different video exhibits in the record. One is Exhibit S1, which there was a mistake in my briefing, Your Honor. I think I said that in my briefing that S1 did not have three different parts. It actually did. I think the first computer I looked it on — added on was a little bit mistaken. So S1 would be consistent with what they claimed was shown to the grand jury. But the other one was an exhibit which had been brought forth by Mr. McIntosh in the context of his motion to withdraw the guilty plea. And that was the video that his counsel had. And that was a video that was not S1. It had four different videos. Two of the videos — of those four videos, only one of the videos, I believe, actually showed that he had signaled. So there's — Mr. McIntosh's contention is that he never saw this. He never saw S1. He never saw the signal prior to the sentencing. And that is supported by the stipulation of fact, again, that impression. But, Your Honor, even if you want to accept, OK, we believe that his attorney went over at least one of these videos with him, we don't really know which one it was. A lot of the focus — S1, the second video within S1, for example, it didn't show him driving. It just showed after the stop, and the focus was on the shooting and things like that. And so there's certainly — the signal of Mr. McIntosh's vehicle, you see within the first — I think it's like 30 seconds of the video. And so it's very possible that you could view a different portion of the video or a different video. In the defendant's exhibit, two of the videos, I think, were also after they had showed up at Mr. McIntosh's house. So my client's contention is that he didn't see any of those videos until S1 at the time of the sentencing, and I think that is consistent with what was agreed to in the context of the plea hearing. But even if the court wants to believe there was some video shown to Mr. McIntosh, it wasn't necessarily — there were multiple videos out there, and it wasn't necessarily one that would have shown the traffic stop. And I'm out of time, so we'll see you in a few minutes. May it please the Court, Counsel. My name is Sharon Shanahan, and I represent the people of the state of Illinois. As this Court knows, this case was briefed by Deputy Director Daley, who's been called out of town in a family emergency. His mother fell and was hospitalized. So I'm going to be relying on his argument, his facts. I have not read the record. I have not seen the videos. Nonetheless, I think that as to the merits, the defendant has to establish two things. One is that not only was this stop not proper, based on a misunderstanding of the statute or whatever, but that it was a crime, and that if a police officer makes an illegal — and I'm kind of putting that in air quotes — stop, it's okay to shoot them. And that's where this whole thing falls apart, is defense counsel very properly looked at the video, looked at the law, and knew that even if the traffic stop was not proper, the law is very clear that it would not apply to evidence of crimes that arrived in reaction to an illegal search or seizure. In the state's brief, they cite to several Illinois Supreme Court cases for this stop. Proposition. The exclusionary rule and the fruit-of-the-poisonous-tree doctrine do not apply to evidence of crimes that arise from, and are in reaction to, an illegal search or seizure. And here I am going to quote the Illinois Supreme Court in Abrams. The statute, it's interesting, is kind of vague in and of itself, you know, do you have to signal for 100 feet, do you have to signal when you just change from one lane to the other, or do you only when you turn in a corner. The case that the defendant relies upon was whether you had to signal for 100 feet before you pulled over to the curb. It's not very clear. And again, I haven't read the statute, but I believe somewhere there — excuse me, I haven't read the statute — that the police officer felt like he had — that it was proper stop because he had to signal for 100 feet, changing lanes. And maybe you do and maybe you don't. I could be wrong there again. As I said, I have not read the record. But nonetheless, that's what he pulled him over for. You say, oh, well, he did have his turn signal on. Okay. That doesn't mean that the stop was bad. If you turn on your turn signal right before, maybe it's not enough. I don't know. But nonetheless, that's what the police officer did, was pull him over for a traffic stop. As a result of being pulled over for this traffic stop, the defendant's reaction, after the drug-sniffing dog walks around the car, is to jump out of his car and start shooting at the police. Now, I'm sorry. Whether this is a good stop or a bad stop, you're not allowed to do that. And what the defense counsel recognized is that, yes, I've seen this video of the stop. I have gone over it with my client. No, I don't think it was a good stop. But I realized it doesn't matter because it doesn't mean that I could suppress the shooting of the police officers, or shooting — shooting and shooting at — leaving one police officer permanently off the force. So the defendant kind of tries to take this very well-established law and focuses in on one part of the Abrams decision that says, this is especially true when the conduct of the officers has not been intentionally unlawful. Now, there's a whole lot of this — of defendant's brief, defendant's reply brief, that basically says, these officers were pulled over for a traffic stop. They were breaking the law. They were out to get young black men. There's nothing in the record that indicates that. And to say that this language in Abrams, who has just said that allowing use of the exclusionary rule in a crime that arises out — or after in the action to a bad stop, is a bad stop. Would set a policy fundamentally in opposition to the civilized rule of law to say that when they then say, this is especially true in the conduct of the officers has not been unintentionally unlawful, creates this whole little subset. And, oh, by the way, in my case, it was unintentionally unlawful. Where? Where? I mean, this is one thing I specifically asked Mr. Daley when we talked last night. Is there anything in the record that establishes that this officer's conduct was intentionally unlawful, that it was criminal, that's the word used in the reply brief? There's nothing. It's a stop. Was it a good stop? Was it a bad stop? It's immaterial, because what the — a motion to suppress would go to is not the underlying traffic stop. It's the shooting. So defendant's argument on appeal kind of rises to the surface. And it rises and falls upon this assertion that this violent post-detention conduct is wiped away by constitutional fiat, because, according to the defendant, the officers singled out — singled out the defendant for an illegal stop and tried to cover it up. Unless that's in the record, there's just — and I am assured that there is not. But you just can't. There's no proposition that's in the record. And I don't think that the statute supports that. It's illogical. It's encouraging a violent species of self-help. So I don't think that — I mean, there is case law that says that — acknowledges that officers can be suddenly confronted with a situation in the field at which the application of a statute is unclear. However, it might later become clear. So we're taking a police officer in the field. He makes a decision that, although his signal was on, was it on long enough? I'm going to pull him over. Then the defendant's reaction is to start shooting at him. That's the thing that matters here, is whether that initial stop was good or not. And I'm not saying either one, because I haven't seen the video. I haven't read the record. But I do think that it's immaterial, whether this underlying stop. And the thing is, the defense counsel testified that he told the defendant this. He said, I sat down with the defendant and I showed him the video. Now, why would he show him the video that only had the last few minutes of it? In any case, the defense counsel testified that he told the defendant this. The trial court believed defense counsel. The fact that he ruled the way he did means he believed defense counsel and did not believe the defendant. And I think that's critical to what we have to consider here today, is that the trial court said, I recognized he knew the law. He knew the law that his — even if this wasn't a good stop, that a motion to suppress would fail. And if it would fail, then it's immaterial. It resolves any claim of ineffective assistance with counsel. It resolves the underlying issue, which is, the defendant said, oh, if only I had known that I had my turn signal on, we could have filed a motion to suppress him. I would have won. Well, he might have won his traffic case. And by the way, that ticket was never actually issued. But it doesn't mean that he would have won that. I thought they found the ticket in the back seat. But it wasn't issued, I don't think. Yes, I think he did get it. It wasn't pursued. It wasn't prosecuted. Or it wasn't issued. I don't think so. Okay. I think that's why it was in the back seat. But, again. In the back seat of the law officer's car? I believe it was in the back seat of the squad car. That's what I think. Oh, okay. I misunderstood. I thought it was in the back seat of the defendant's car. I believe it was in the back seat of the officer's car. I believe so, too. Okay. That it was never given to the defendant. Yes. I have. Oh, thank you. I kind of have a feeling everything kind of fell apart quickly when gunshots started flying. Thank you. Your Honors, the question in this case is not whether my client was right in shooting at police officers, whether he did shoot at police officers, or even whether there was a Fourth Amendment violation. The question is whether the motion to withdraw a guilty plea should have been withdrawn. Whether this misapprehension of fact meant that my client's plea was involuntary. So in terms of the standards, we don't need to show that there was a Fourth Amendment violation or any of the other things that she was talking about. We need to show that Mr. McIntosh would not have pled guilty but for this misapprehension. I don't mean to stop you there, but if we get past that issue of the misapprehension, that we get to the Fourth Amendment, I'd like to hear your thoughts about this intervening reaction by the defendant and how that broke the chain, so to speak. Sure. And a couple of things. First of all, the Abrams rule, the rule in Abrams, I don't think we were really kind of speaking selectively. Abrams specifically said when we're not talking about intentional police misconduct. You have to remember that the rule in terms of a reaction, that's an exception to the exclusionary rule. The exclusionary rule is the rule, and we're talking about clearly defined exceptions of exclusionary rule. So where Abrams recognized it and where the court recognized it is where it wasn't intentional police misconduct. Now, she focused a lot on the record doesn't show intentional police misconduct. First of all, my client had subpoenaed the officers for the hearing on the motion to withdraw the guilty plea. The judge specifically said, well, this isn't really about the Fourth Amendment, so I'm not going to hear that testimony anyway. So he never had the opportunity to fully present that. Secondly, Your Honor, there is information in the record, specifically if you look at S1, I think it's around 740, Officer Stratman specifically said, I saw this car pull out of the Fairfield Inn, and I don't remember if it was there before, but looking at this guy's history, I thought we ought to check it out. So in addition to that, there were a lot of other statements there that implied that this was an investigatory stop. And even Mr. Mattis, Mr. McIntosh's counsel testified that he believed the stop was completely pretextual. So there is evidence in the record that it was more than a mere mistake of law, and Mr. McIntosh never had the opportunity to have a full and fair hearing on that, because he had subpoenaed those officers for his hearing on the motion to withdraw his guilty plea. And they didn't show up, and the court said, I'm not going to hear them anyway, we're going forward. That's not what this is about. So I think that that's an important issue with regard to that. And, Your Honors, again, the Fourth Amendment is one prong of one issue within this argument. So one reason to withdraw a guilty plea is if there was a defense available of which the defendant was unaware. That's one reason. But the misapprehension of fact itself, and if that affected his guilty plea, was a reason to withdraw the plea. And we've talked a lot about the performance of official duties thing. And I think what the State is proposing, Your Honor, is whether a law enforcement officer is following the Constitution is somehow not relevant to the question of whether he's performing an official duty, whether he's following the law, whether he's carrying out the law when he's acting as a law enforcement officer. That's not relevant to the question of whether he's performing an official duty. I think that is relevant. I think it should be relevant as a matter of law, and even if this Court does not find it relevant as a matter of law, Hoy says this performance of official duty is a question for the jury. I think a lot of jurors would find that relevant. The grand jury didn't even have the truthful information with regard to that in front of them. So, again, this Court does not need to reach that issue. The reality is, Your Honor, there were arguable Fourth Amendment issues here of which my client was not aware. There was an arguable defense about performance of official duties of which my client was not aware. My client chose to plead guilty to a range of punishment of 20 to 45 years because his lawyer had told him there aren't really any defenses that we can pursue. Plenty of people in these kinds of situations where there are arguable defenses will roll the dice or go to trial or roll the dice and start pursuing those defenses and see if the deal gets better. That's what my client is saying. He would have chosen to plead voluntary and had he known that these defenses were available. And that's the question that this Court has to answer, is essentially, based on this massive misapprehension of fact, was his plea voluntary? And my client's contention is that it was not. Thank you. Thank you, Counsel, for your arguments. The Court takes the matter under advisement to enter a decision to be forced.